IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


DAVID CABELLO,                          :
                                        :
        Plaintiff                       :
                                        :  CIVIL NO. 1:CV-08-1334
    vs.                                 :
                                        :  (Judge Caldwell)
JAMES L. GRACE,                         :
SUPERINTENDENT, *ET AL.*,               :
                                        :
        Defendants                      :


*M E M O R A N D U M*


I.    *Introduction*

           The pro se plaintiff, David Cabello, brought this civil rights action under 42

U.S.C. § 1983 against multiple Department of Corrections (DOC) staffers and medical-care

providers at the Huntingdon State Correctional Institution (SCI-Huntingdon), in Huntingdon,

Pennsylvania.  Plaintiff is making an Eighth Amendment challenge to the medical care he

received for his diabetes.[1]  Before the Court is the medical-care defendants' Motion for

Summary Judgment.[2]  The medical-care defendants are: Physician Assistant (PA) Auman;

Luis Araneda, M.D.; Olga Beresgovkava, M.D.; and Joseph Romeo, M.D..

-----

[1]  David Cabello is not presently incarcerated.  He currently lives in Levittown, Pennsylvania.

[2]  The Court granted the DOC defendants' motion to dismiss for failure to state a claim on
December 9, 2008.  *See* Doc. 59.  As a result, Corrections Health Care Administrator, Mary Lou
Showalter; Superintendent James L. Grace; and Deputy Superintendent, Raymond Lawler were
dismissed from the action.  *Id.*

For the reasons that follow, the court will grant the defendants' motion for summary judgment.

II. *Background*

In his Amended Complaint, Plaintiff alleges defendants violated his Eighth Amendment rights when they failed to provide him adequate medical care for his borderline diabetic condition by continually ignoring his complaints of side effects from his medication. *Id.* On August 21, 2009, the court granted in part, and denied in part, the medical defendants' motion to dismiss. The court dismissed Cabello's retaliation claims against all medical defendants except PA Auman. Doc. 105 at p. 24.[3] The remainder of the motion was denied. Although Cabello was granted leave to file an amended complaint concerning his retaliation claim against the other medical defendants, he did not do so. *Id.*

To summarize Plaintiff's remaining allegations, Cabello claims that in April 2006, he was diagnosed with Type II diabetes by Dr. Beresgovkava and prescribed two 500 mg. tablets of Metformin daily. Doc. 32, Am. Compl. at p. 2. In February 2007, on Plaintiff's own initiative, he started taking only one tablet daily. *Id.* at p. 5. In April 2007, Dr. Klemick adjusted Cabello's prescription, prescribing only one 500 mg Metformin tablet daily because two tablets was "too much." *Id.* In November 2007, when Plaintiff went to renew his Metformin prescription, PA Auman advised him his liver enzymes were high. *Id.* On

---

[3] Unless otherwise noted, all citations to the record are to the docket number and page number assigned by the electronic case filing system (CM/ECF) rather than the page numbers of the original documents.

December 3, 2007, Cabello refused to take any Metformin.  Since stopping his Metformin in December 2007 he has not suffered from the recurring side effects or adverse symptoms he previously experienced.  *Id.*

Cabello believes he suffered for twenty months with a variety of ailments caused by his ingestion of Metformin.  He claims to have suffered lightheadedness, weight loss, elevated liver enzymes, and abdominal pains, all symptoms of a "life-threatening condition called lactic acidosis from the accumulation of Metformin" in his system.  *Id.*  He claims that the defendants' "repeated long-term negligent treatment of plaintiff's medical condition, rather than intentional actions, may amount to deliberate indifference to a serious medical need."  *Id.* at p. 3.  He believes it unreasonable that defendants, medical professionals, did not take his medical complaints seriously and failed to follow his diabetes condition properly resulting in "pain and suffering and emotional injuries."  *Id.* at pp. 6 - 7.

The medical defendants seek summary judgment on the grounds that: (1) there was no deliberate indifference to Cabello's medical needs; (2) he fails to produce evidence of an injury allowing him to recover monetary damages; and (3) he fails to state a retaliation claim against PA Auman.

III.    *Summary Judgment Standard*

Under Fed. R. Civ. P. 56, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In pertinent part, parties moving for, or opposing, summary judgment must support their position by "citing to

particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In deciding a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The moving party bears the initial responsibility of stating the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). When a moving party has carried its burden, the burden shifts to the nonmoving party to demonstrate that an issue of material fact exists. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (citations omitted). "The non-moving party cannot rest on mere pleadings or allegations," *El v. Southeastern Pennsylvania Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007), but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 231-32 (3d Cir. 2001). Unsubstantiated arguments and statements made in briefs cannot be treated as evidence. *Versarge v. Twp. of Clinton N.J.*, 984 F.2d 1359, 1370 (3d Cir. 1993). Allegations made without evidentiary support may be disregarded. *Jones v. UPS*, 214 F.3d 402, 407 (3d Cir. 2000). "Conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir.

-4-

2002). Hearsay testimony contained in affidavits or statements that would be inadmissible at trial may not be included in an affidavit to oppose summary judgment. *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Comp.*, 998 F.2d 1224, 1234 n. 9 (3d Cir. 1993). The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989). While "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor" in determining whether a genuine factual question exists, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), summary judgment should not be denied unless there is sufficient evidence for a jury to reasonably find for the nonmovant. *Id.* at 249, 106 S.Ct. at 2510; *see also Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009).

In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511. An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law. *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510).

Middle District Local Rule 56.1 explains that facts set forth in a concise statement of material facts, complete with references to the parts of the record that support the statements, "will be deemed to be admitted unless specifically denied or otherwise

controverted" by the opposing party as required by the rule.  *See* M.D. Pa. Local Rule 56.1;

*Accord* Fed. R. Civ. P. 56(c) and 56(e)(2).[4]


IV.     *Statement of Undisputed Facts*

We take this background from the properly supported factual assertions in the

parties' briefs and the evidentiary submissions.

David Cabello was born on December 20, 1972.  Doc. 129, Defs.' Statement

of Uncontested Facts (DSF) at ¶ 28.  Prior to his incarceration he was a drug addict and

drank excessively.  Doc. 131-9, Ex. H, Cabello Dep. at p. 28.  Before he was transferred to

the DOC, Cabello was advised that he was a borderline diabetic.  *Id.*  He entered the DOC

in 2004, and has resided at SCI-Huntingdon since January 2005.  *Id.* at p.8.  Cabello

suffers from mental illness.  *Id.* at p. 47.  He is bipolar and suffers from post-traumatic

stress disorder and anxiety for which he takes several medications, and on occasion, has

been housed at SCI-Waymart for psychiatric reasons.  *Id.* at p. 9.  Plaintiff took Remeron

for his mental health issues from 2004 to 2006.  DSF at ¶ 31.  He requested to stop taking

---

[4] On July 15, 2008, Plaintiff was issued this Court's Standing Practice Order informing the parties of their briefing and other responsibilities.  *See* Doc. 4, Standing Practice Order.  This order specifically includes a party's obligations with respect to filing and responding to summary judgment motions.  *Id.* at pp. 4 - 5.  Defendants filed a Statement of Uncontested Facts, complete with references to supporting exhibits.  *See* Doc. 129, Defs.' Statement of Uncontested Facts (DSF). Cabello did not file a counter-statement of facts, claiming he "is not a lawyer and was unaware of this rule and does not see the reason for answering unimportant facts laid out in 202 paragraphs that most have nothing to do with prescribing and continuing 1000 mg. of Metformin to a non-diabetic." *See* Doc. 135, Pl.'s Answer to All Defendants' Uncontested Facts.

this medication in early 2006.  Doc. 131-10, Ex. I, Cabello's Med. Records at pp. 4, 5, and 9.

On January 17, 2006, Dr. Araneda met with Cabello.  Dr. Araneda's progress note from the encounter indicates that diabetes runs in Cabello's family and that he has a history of "elevated LFT."[5]  Doc. 131-10 at p. 2.  Cabello's mother is an insulin dependent diabetic.  DSF at ¶ 68.  On January 26, 2006, Cabello had a fasting blood sugar (FBS) of 138, and a two hour glucose test of 139.  *Id.* at p. 3.  Both results were elevated.  Doc. 131-14, Ex. L, Araneda Decl. at ¶ 7.  A normal range was 70-109.  *Id.*  At that time, Cabello refused to accept a special diet or exercise.  *Id.*  He was placed on the diabetes chronic care clinic list and given information about diabetes.  *Id.*  He was advised that he was a borderline diabetic.  Doc. 131-10 at p. 3.

On February 7, 2006, Cabello returned to the medical unit, seeking to be placed on a diabetic diet.  DSF at ¶ 64.  PA Mills, a non-defendant, wrote an order for the diet.  *Id.*  On April 7, 2006, Cabello was counseled about his compliance with the diet.  *Id.* at ¶ 66.  He received additional information packets on diabetes.  *Id.* at ¶ 67.

On April 7, 2006, Dr. Beresgovkava discussed the results of Cabello's March 2006, HGBA1C[6] test with him explaining that was elevated.  *Id.* at ¶ 68.  His January 2006 HGBA1C test was also elevated.  Doc. 131-10 at p. 10.  Cabello was given extensive

_____

[5]  LFT stands for liver function tests.

[6]  Also known as an A1C or glycated hemoglobin test, this blood test provides a long term look at the patient's average blood sugar control for the past 2 to 3 months.  *See* www.diabetes.org.

education on diabetes, diet, and added to the diabetes chronic care clinic, and started on Glucophage.[7]  *Id.* at ¶ 68.  Dr. Beresgovkava prescribed Cabello one tablet of Glucophage 500 mg. by mouth BID (twice daily) for 180 days.  Doc. 131-10 at p. 12.  He was scheduled to see Dr. Beresgovkava in four weeks.  *Id.*  On May 3, 2006, Cabello was seen by Dr. Beresgovkava and denied any side effects from the Glucophage.  *Id.* at ¶ 69; Doc. 131-10 at p. 14.

On June 6, 2006, Cabello complained that his blood sugar had not been checked since August 2004.  He was advised that it was last checked on May 31, 2006.  DSF at ¶ 71.  His HBCA1C at the time was 5.9.  Doc. 131-10 p. 19.  Ten days later, he was seen in the RHU, and sought information as to his recent blood studies.  PA Auman advised him that his HBGA1C was 5.9 and his TSH was 6.46.  DSF at ¶ 73.

On July 17, 2006, Cabello came to the medical unit seeking a renewal of his Glucophage script because he had lost his medication.  *Id.* at ¶ 75.  He indicated he had not taken his medication for four (4) days and that his sugar levels were up.  *Id.*  A finger stick glucose test was performed and his blood sugar was 149.  He was told to return to his cell and wait for sick call.  *Id.* at ¶ 75.  He returned to the medical unit less than two hours later.  Doc. 131-10 at p. 23.  He was seen by PA Auman.  Doc. 131-10 at pp. 23-25.  He reported that his temperature was up and he did not feel well.  DSF at ¶ 75.  He advised PA Auman that he was only taking one Metformin tablet a day instead of two as prescribed.  Doc. 131-10 at p. 24.  PA Auman informed Cabello that he would no longer be permitted to

---

[7]  Metformin is the generic form of Glucophage.

self-medicate to prevent "the issue of doubt, misuse." *Id.* Cabello became upset and said he would not report to get his medication. DSF at ¶ *75.* When PA Auman believed Cabello became arrogant and abusive, she ordered him to leave. Doc. 131-10 at p. 24. When he would not leave after repeated orders to do so, he was escorted out of the medical unit by a corrections officer. *Id.*

Three days later, Cabello presented to sick call with complaints of head, chest, abdomen, liver, pancreas, kidney, thyroid discomfort and pain. *Id.* at ¶ 77. PA Auman scheduled Cabello to be seen by a physician the next day. *Id.* at ¶ 78. When seen by Dr. Beresgovkava, Plaintiff said he had not been feeling well for a week. He complained of being under stress and suffering from chills and dizziness in the morning. *Id.* at ¶ 79. Dr. Beresgovkava diagnosed Cabello as suffering from viral syndrome. *Id.* She ordered a urinalysis, an HIV test (at Cabello's request), blood sugar checks twice a day for seven days, as well as blood pressure and heart rate checks. *Id.* at ¶ 80; Doc. 131-10 at p. 27. Due to his complaints of weight loss, his weight was to be recorded monthly for 3 months. DSF at ¶ 79. At the time Cabello weighed 190 pounds. Doc. 131-10 at pp. 26-27. Cabello's July 26, 2006, urinalysis was negative. *Id.* He was listed for physician line the following week. *Id.*

On August 4, 2006, Cabello saw Dr. Beresgovkava and complained of dizziness in the morning and mental trauma as a result of receiving the "wrong treatment." DSF at ¶ 82. He was noted as "very emotional." Doc. 131-10 at p. 28. His weight was 189. *Id.* Dr. Beresgovkava reviewed his accucheck "flow sheet". *Id.* She assessed Cabello's diabetes as "well controlled," noting he was "slightly low in morning" and that he

was adjusting poorly to the RHU. *Id.* She ordered a snack bag for him as well a psychological referral. *Id.*; DSF at ¶ 82.

On August 15, 2006, Cabello refused to speak with PA Auman, but related to RHU officers that he was suffering from lightheadedness and dizziness, and headrush accompanied by nausea. DSF at ¶ 84; Doc. 131-10 at p. 30.

On September 12, 2006, Cabello was seen in the medical unit and requested a bottom bunk status because of low back pain and complaints of dizziness and lightheadedness due to his Glucophage. DSF at ¶ 85; Doc. 131-10 at p. 31. His last HGBA1C test of September 2, 2005, was 5.9. PA Mills ordered a FBS to evaluate his complaints of lightheadedness and dizziness. *Id.* Three days later, Cabello was seen by Dr. Araneda. DSF at ¶ 86. He complained of morning lightheadedness, heartburn and chest pain. Dr. Araneda noted that Cabello suffered from diabetes mellitus (DM), dizziness of unknown etiology, and autonomic nervous imbalance. Dr. Areneda also sought to rule out mental disease. *Id.*; Doc. 131-10 at p. 32. A CBC with differential, sediment rate, urinalysis, chest X-ray, EKS and referral to a psychiatrist was ordered. *Id.* at p. 34.

On September 19, 2006, Cabello was seen by PA Mills. *Id.* at p. 33. He reported no longer feeling dizzy but "just doesn't feel right." *Id.* On September 21, 2006, Dr. Altman noted that the patient should not be scheduled to the psychiatric line unless specifically requested by Cabello. DSF at ¶ 88.

Cabello was seen by Dr. Araneda on September 27, 2006. *Id.* at ¶ 89; Doc. 131-10 at p. 35. At that time he reported that his dizziness was gone and that he felt better. Dr. Araneda noted the presence of bacteria in his urine and diagnosed him as having a

urinary track infection.  *Id.*  He was prescribed medication and follow up tests were ordered. *Id.*; Doc. 131-11 at p. 4.  On October 4, 2006, Dr. Romeo reviewed Cabello's lab results with him and his treatment plan was continued.  DSF at ¶ 90.

Two days later Cabello returned to the medical unit concerned about weight loss while in the RHU and chest pain.  *Id.* at ¶ 91; Doc. 131-10 at p. 35.   He stated he is 6 feet 1 inches tall and weighs 185 pounds.  Doc. 131-10 at p. 35.  On October 24, 2006, Cabello complained to medical staff of burning with urination and felt that he had another urinary track infection.  DSF at ¶ 92.  A urine test was done and the normal results were reviewed with Cabello.  *Id.* at ¶ 93.

On October 26, 2006, Cabello was scheduled to attend the diabetes clinic in early November 2006.  His twice daily script for Glucophage 500 mg was renewed.  He was scheduled for a fasting HGBA1C and urine test.  *Id.* at ¶ 94; Doc. 131-11 at p. 4.  Dr. Araneda reviewed Cabello's lab results on November 3, 2006.  DSF at ¶ 95.  On November 9, 2006, Cabello requested renewal of his MVI (multivitamins).  The medical interview was terminated by PA Mills after Cabello became uncooperative.  It was noted that Cabello's MVI were already ordered until February 2007.  *Id.* at ¶ 96; Doc. 131-11 at p. 3.

On January 23, 2007, Cabello was seen by a nurse at the request of Mary Lou Showalter to discuss whether he was taking his Glucophage correctly.  DSF at ¶ 97. Cabello reported only taking one tablet of Glucophage daily instead of one tablet twice daily.  *Id.*; Doc. 131-11 at p. 5.  The next day Cabello was brought to the RHU medical room for chronic care clinic and to discuss his medication compliance.  *Id.* at pp. 5-6. Cabello refused to speak with PA Auman about the issue and preferred to speak to a

doctor. *Id.*; DSF at ¶ 98. On February 10, 2007, after receiving his evening dose of Glucophage, Cabello attempted to destroy it but was stopped by a corrections officer. *Id.* at ¶ 100; Doc. 131-11 at p. 6. Cabello refused to take his evening dose of Glucophage on March 4 and 5, 2006. *Id.*; DSF at ¶ 101.

On March 8, 2007, Dr. Klemick indicated that Cabello was a type II diabetic. He noted Cabello's November 2006 HGB A1C was 5.4, and glucose test was presently 102 but had fluctuated between 105 to 136 in the past week. DSF at ¶ 102; Doc. 131-11 at p. 6. Dr. Klemick reduced Cabello's Glucophage to one 500 mg tablet daily for 60 days and ordered follow up glucose testing. *Id.* at p. 7. Cabello advised Dr. Klemick that he has made eating and lifestyle changes. *Id.* at p. 8. On May 1, 2007, Cabello advised Dr. Klemick he was doing "ok" on one Glucophage daily. Dr. Klemick reviewed Cabello's morning glucose test results and urged Cabello to watch his diet and lose some weight. *Id.* at p. 9. His April HBGA1C test was 5.8. *Id.* Glucose checks were ordered. *Id.*; DSF at ¶ 103. Cabello was schedule for medical line in June for reevaluation. DSF at ¶ 104.

On May 22, 2007, Cabello presented to the diabetes clinic. *Id.* at ¶ 105. He had no complaints and was taking one Glucophage tablet daily. *Id.*; Doc. 131-11 at p. 11. He weighed 190 pounds. *Id.* On June 5, 2007, Dr. Klemick allowed Cabello to start self medicating his Glucophage medication. DSF at ¶ 107.

On June 21, 2007, Cabello presented to the medical unit with complaints of chest pain and tingling in his extremities after intense cardio workout. Doc. 131-11 at p. 14; DSF at ¶ 108. His EKG was unchanged when compared to his September 2006 test. He was diagnosed as having muscle strain and a short term of anti-inflammatory medication

-12-

was suggested.  *Id.*  Three days later Cabello complained of dizziness and lightheadedness while playing handball while it was extremely hot.  DSF at ¶ 109.  He was advised to drink water and to rest.  *Id.*  Two days later he was seen in sick call for complaints of chest pain. He requested a chest X-ray, a stress test and to see a physician.  *Id.* at ¶ 110; Doc. 131-11 at p. 16.  He was seen two days later by Dr. Romeo who ordered Motrin for his pain.  DSF at ¶ 111.  The following day he returned to the medical unit with complaints of chest pain. He had no shortness of breath, nausea or vomiting.  Doc. 131-11 at p. 17.  He said he had experienced this chest pain for "about five weeks."  *Id.*  He was medically evaluated by a nurse and told to follow the sick call procedures.  *Id.*

On August 15, 2007, Cabello was seen after suffering a left ankle sprain.  He was prescribed Motrin, had an X-ray, and was given crutches.  *Id.* at pp. 18 - 19; DSF at 113.  He returned the crutches on August 21, 2007.  *Id.* at ¶ 114,

On August 23, 2007, a physical examination of Cabello was performed by Dr. Araneda.  *Id.* at ¶ 115; Doc. 113-11 at p. 19.  Cabello's blood sugar was noted as "under control" and there was no fracture of his ankle.  *Id.*

On November 13, 2007, Cabello was seen in the diabetes clinic.  DSF at ¶ 117.  He was advised of his elevated LFTs and advised the test would be repeated.  Doc. 131-11 at p. 22.  PA Auman advised that there "may [be a] need to d/c meds if not returning to normal levels."  *Id.*

On December 6, 2007, after failing to appear for sick call on two prior occasions, Cabello appeared at the medical unit requesting to be placed in doctor line "to talk about my Metformin.  I stopped it."  DSF at ¶ 119; Doc. 131-11 at p. 23.  He was seen

-13-

on December 10, 2007, by Dr. Klemick.  DSF at ¶ 120; Doc. 131-11 at p. 24.  Cabello told Dr. Klemick that he feels his episodes of lightheadedness, heartburn, sneezing, and chest discomfort are all due to his Glucophage.  Since stopping this medication on December 1, 2007, he has felt fine.  *Id.*  Dr. Klemick advised Plaintiff to continue his healthy habits and decrease smoking.  *Id.*  He also ordered fasting blood sugar testing and HBG A1C testing.  DSF at ¶ 121; Doc. 131-11 at p. 26.  Cabello's Glucophage script was discontinued.  *Id.*  His December 24, 2007, HBG A1C test result was 5.9.  Doc. 131-11 at p. 27.

On January 10, 2008, Cabello was advised that his LFTs were slightly elevated but significantly lower than in October 2007.  DSF at ¶ 124.  Four days later he was seen again by medical staff and noted feeling better.  *Id.* at ¶ 125.  On February 26, 2008, he was seen and advised of the blood sugar levels taken on February 4, 11 and 25  All levels were elevated except for the morning of February 11, 2008, when his sugar was 99.  He was again advised to stop smoking.  *Id.* at ¶ 127.  Three days later he was seen at sick call for complaints of the flu, a head cold and upper respiratory infection.  *Id.* at ¶ 129.  He returned to sick call on March 4, 2008, with a left temporal headache.  He was given Ibuprofen which helped.  *Id.* at ¶ 127.

On April 3, 10 and 15, 2008, Dr. Klemick conducted a review of Cabello's chart to monitor his blood sugar levels.  *Id.* at ¶ 131.  Cabello's Blood Glucose Flow sheets for March 13, 2007, through June 24, 2007, show 27 entries (four of which were "no show" entries).  DSF at ¶ 122.  The remaining entries reflected results all above 100 except for June 24, 2007, which was 86.  His highest reading was 164 on May 26, 2007.  His Blood Glucose Flow sheets for December 17, 2007 through April 14, 2008, contained 25 entries

with only one being a "no show". *Id.* at ¶ 123. During this time period his lowest reading was 99 while his highest was 190. *Id.*

On May 3, 2008, Cabello refused to attend the diabetes clinic. *Id.* at ¶ 132. On September 25, 2008, Cabello requested to be put on the medical doctor's line because he wanted to renew his Glucophage. *Id.* at ¶ 133; Doc. 131-11 at p. 31. The same day Dr. Poland reordered Cabello 500 mg Glucophage daily. Doc. 131-11 at p. 34. On October 10, 2008, Cabello had an abnormal thyroid lab results. *Id.* at ¶ 135; Doc. 131-11 at p. 35. On October 16, 2008, additional testing was ordered. DSF at ¶ 137. It was also ordered that Cabello was to have his blood sugar tested morning and afternoon for three days as well as receive a diabetic snack pack once a day for 180 days. *Id.* At that time, PA Poland identified Cabello as a non-insulin dependent diabetic. Doc. 131-11 at p. 35. On October 28, 2008, Cabello was seen in diabetes clinic. DSF at ¶136. He indicated that he gets side effects from Metformin and has not had any since he stopped the medication in December 2007. *Id.*

Dr. Romeo is a physician licensed to practice medicine in the Commonwealth of Pennsylvania. *Id.* at ¶ 139. At all times when treating Cabello, Dr. Romeo used his best medical judgment when determining what treatment he should receive for his medical complaints. *Id.* at ¶ 142. In October 2006, Dr. Romeo reviewed Cabello's laboratory results and decided to continue his treatment plan, including the Glucophage. It was appropriate for Cabello and there were no contraindications to the treatment. *Id.* at ¶ 148. In October 2006, when Cabello complained of burning upon urination, Dr. Romeo ordered testing and determined his complaints were not related to the Glucophage he was

-15-

receiving.  *Id.* at ¶ 150.  On June 21, 2007, Cabello complained of chest pain.  An EKG was done and he was diagnosed as having muscle strain.  His symptoms were not related to his medication.  *Id.* at ¶ 152.  On June 24, 2007, Cabello was seen again for complaints of dizziness and lightheadedness.  He was advised to rest and drink plenty of water.  Dr. Romeo did not treat Cabello after June 2007.  *Id.* at ¶ 155.  At no time when treating Cabello did Dr. Romeo believe that the medical treatment he was providing to Cabello presented a substantial risk of harm.  *Id.* at ¶ 159.  Nothing Dr. Romeo did, or failed to do, caused injury to Cabello.  *Id.* at ¶ 161.

Angela Auman is a physician's assistant licensed to practice in the Commonwealth of Pennsylvania.  *Id.* at ¶ 163.  PA Auman has knowledge and information concerning the medical care given to Cabello from January 2006 to October 2008.  *Id.* at ¶ 164.  At all times, PA Auman used her best medical judgment when determining what treatment Cabello should receive for his medical complaints.  *Id.* at ¶ 167.  Cabello's glucose levels were monitored appropriately at all times.  *Id.* at ¶ 175.  When treating Cabello, PA Auman did not see any adverse side effects which would require the discontinuance or reduction of Glucophage.  *Id.* at ¶ 176.  At all times during which PA Auman participated and reviewed Cabello's medical care and treatment, she did so in the belief that the treatment provided was the most medically appropriate for his condition under the circumstances.  *Id.* at ¶ 178.  At no time did PA Auman believe that the medical treatment that was being provided to him presented a substantial risk of harm to him.  *Id.* at ¶ 179.  Nothing PA Auman did, or failed to do, caused injury to Cabello.  *Id.* at ¶ 180.  At all times PA Auman used her best medical judgment.  *Id.* at ¶ 181.

Luis Araneda is a physician licensed to practice medicine in the Commonwealth of Pennsylvania.  *Id.* at ¶ 184.  He has knowledge and information concerning the medical care given to Cabello from January 2006 to October 2008.  *Id.* at ¶ 185.  At all times, Dr. Araneda used his best medical judgment when determining what treatment Cabello should receive for his medical complaints.  *Id.* at ¶ 187.  On September 15, 2006, Dr. Araneda saw Cabello after he complained of lightheadedness and dizziness in the morning only.  After examining him, Dr. Araneda ordered various blood studies, a chest X-ray, EKG, urinalysis and psychiatric referral.  *Id.* at ¶¶ 194 - 195.  Dr. Araneda states that none of Cabello's symptoms that day were related to taking Glucophage.  *Id.* at ¶ 194.  On September 27, 2006, Cabello reported the dizziness was gone and he felt better.  It was believed he had a urinary track infection.  *Id.* at ¶ 196.  Cabello's glucose levels were monitored appropriately at all times, with blood studies and finger stick studies.  *Id.* at ¶ 197.  At no time did Dr. Araneda deny medication or care and treatment which he felt was medically necessary.  *Id.* at ¶ 198.  At all times during which Dr. Araneda participated and reviewed Cabello's medical care and treatment, he did so in the belief that the treatment provided was the most medically appropriate for his condition under the circumstances.  *Id.* at ¶ 199.  At no time did Dr. Araneda believe that the medical treatment that was being provided to Cabello involved a risk of harm to him.  *Id.* at ¶ 200.  Nothing Dr. Araneda did, or failed to do, caused injury to Cabello.  *Id.* at ¶ 201.

On March 15, 2010, David Cabello was deposed.  *Id.* at ¶ 27; Doc. 131-9, Ex. H, Cabello Dep.  Cabello does not disagree with the treatment method of the medical defendants.  Doc. 131-9 at pp. 33-34.  Rather, he believes defendants were deliberately

indifferent to his medical needs by continuously ignoring his complaints about the side effects of the medication he was given, Metformin. *Id.* at pp. 16, 27 and 28. He believes he was prescribed too much Metformin as a borderline diabetic and that his diabetic condition was not properly monitored. *Id.* at pp. 16 and 22. Cabello recalls staff taking blood "because of complaints" to check his blood sugar. *Id.* at p. 31. Cabello understands that an HGBA1C test checks his blood sugar and that records in his medical file show that a result over six is bad. *Id.* at p. 41. Yet, he does not believe such a result "callas] for 2 500-milligram tablets of Metformin." *Id.* Rather, he believes a HGBA1C result over six "could be treated by diet and exercise."

Cabello believes defendants "had every chance to discontinue [his] Metformin but they didn't until [his] liver enzymes were high, which proves that there was something wrong." *Id.* at p. 33. He claims his lightheadedness, dizziness, chest discomfort, waking up in the middle of the night, gagging on phlegm were all side effects of the Metformin. *Id.* at p. 34. Cabello claims he has not been sick or had the flu since stopping the Metformin in 2007. *Id.* at 35. Although he cannot point to any laboratory studies that show that he suffered from lactic acidosis, he believes the "side effects [he] had from Metformin that could have been similar to lactic acidosis." *Id.* Cabello believes that when Dr. Beresgovkava diagnosed him as having the flu he was suffering from symptoms associated with lactic acidosis. *Id.* at pp. 35 - 36. He never discussed this concern with the doctors at SCI-Huntingdon. *Id.* at p. 36 and 38. He also admits that on the day he was deposed he did not suffer from acidosis. *Id.* He was told, on at least one occasion, that his lightheadedness was due to a urinary infection. He admits to seeing laboratory results in

his medical record that indicated that he had a urinary track infection. *Id.* at p. 39. Yet, after doing some research, he doesn't believe he suffered from a urinary infection. *Id.* at pp. 38 - 39. Cabello states he did not suffer brain damage as a result of ingesting Metformin. *Id.* at p. 27. At the time of his deposition, Cabello denied having any "mental or physical damage" as a result of taking Metformin. *Id.* at p. 28. Cabello admits that he thought he suffered at times from low blood sugar levels, but "it seems that [he] had an anxiety attack" from a car accident he was involved in years ago. *Id.* at pp. 64 - 65. He has no evidence that the Metformin caused him to have low blood sugar. DSF at ¶ 58. In February 2010 Cabello's recent HGBA1C test result was 6.7. Doc. 133 at pp. 4-5. In Dr. Sheaf's professional clinical opinion, Cabello did not need treatment at that time as his test results indicated Diabetic Control. *Id.* at p. 5. Cabello's diabetic condition continues "to be monitored as per chronic clinic guidelines." *Id*

Cabello believes PA Auman retaliated against him for filing a grievance against her but does not know the date of the grievance. Doc. 131-9 at pp. 47-49, 59-60. Grievance 156307, dated June 28, 2006, mentions PA Auman as well as other medical staff. DSF at ¶ 2; *see also* Doc. 131-4, Ex. C, Grievance Packet for Grievance No. 156307. In this grievance, he generally complains about his diabetic care. *See* Doc. 131-5 at p. 5. Cabello does not remember being treated by PA Auman until July 17, 2006. Doc. 131-9 at p. 51. His retaliation claim is based on his July 17, 2006, encounter with her. *Id.* at p. 60. At that visit he said that he was sick and had lost his diabetes medication. *Id.* at pp. 60-61. He disputes that he became argumentative with PA Auman during the encounter or when she told him he would no longer be able to self-medicate for diabetes. *Id.* at pp. 61-62. He

filed grievance 15807 against PA Auman after this encounter. Doc. 131-6, Exh. E, Grievance Packet for Grievance No. 15807. Cabello did not file an appeal of this grievance to final review. DSF at ¶ 14.

On November 20, 2007, Cabello filed grievance 207781, in which he states he has been prescribed too much Metformin and did not want to be treated by PA Auman. Doc. 131-8, Ex. G, Grievance Packet for Grievance No. 207781. He appealed this grievance to final review. It was referred to the Bureau of Health Care Services. DSF at ¶ 24. On February 4, 2008, the Bureau found the treatment Cabello received for his diabetes and elevated liver tests was reasonable and appropriate. *Id.* at ¶ 24. On May 2, 2008, after claiming he had not received a copy of the Bureau of Health Care's response, he stated he "must refuse treatment" until a response is received. Doc. 131-8 at p. 6. He did in fact refuse to be seen at the following day at the diabetes chronic clinic. Doc. 131-11 at p. 30.

"Plaintiff does not have any evidence that PA Auman retaliated against [him] for filing grievances. There is no evidence that PA Auman retaliated against the Plaintiff, but there is evidence that PA Auman did not take plaintiff's vital signs or even check his blood sugar while he complained of being sick" on July 17, 2006. Doc. 132, Pl.'s Opp. Br. at pp. 7-8. There is no evidence that PA Auman was untruthful in a misconduct report in retaliation for naming her in a grievance, but there is evidence she ignored the adverse effects and overdose of Metformin for 20 months as did the other defendants. *Id.* He claims PA Auman never spent any time discussing diabetes or his laboratory tests. Doc.

131-9 at p. 30. Cabello wanted PA Auman "to stop acting indifferent to [him]. [He] wanted her to stop treating [him] like a nuisance." *Id.* at p. 51.

V.    *Discussion*

   A.    *Cabello's Eighth Amendment Claim.*

      Cabello believes, given his borderline diabetic condition, that defendants prescribed too much Metformin and then ignored his complaints of side effects.

      The Eighth Amendment prohibits cruel and unusual punishment. U.S. CONST. amend. XIII; *see Wilson v. Seiter*, 501 U.S. 294, 296-97, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991). In order to establish a denial of medical care claim under the Eighth Amendment, a prisoner "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 105-06, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). Allegations of malpractice or negligent treatment are insufficient to entitle a plaintiff to relief. *Id.*

      A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994). The inmate must satisfy this two-part conjunctive test. Without the requisite mental state, a prison official's conduct alone will not constitute deliberate indifference. *Id.,* 511 U.S. at 837-38, 114 S.Ct. at 1979. To be deliberately indifferent, a prison official must know of, and disregard, an excessive risk to inmate health or safety. *Id.,* 511 U.S. at 837-38, 114 S.Ct.

-21-

at 1979.  Deliberate indifference can be shown by a prison official "intentionally denying or delaying access to medical care or intentionally interfering with [medical] treatment once prescribed."  *Estelle*, 429 U.S. at 104-05, 97 S.Ct. at 291.

Furthermore, deliberately delaying necessary medical diagnosis for a long period of time in order to avoid providing care may constitute deliberate indifference that is actionable.  *See Durmer v. O'Carroll*, 991 F.2d 64 (3d Cir.1993).   A medical need is serious where it "has been diagnosed by a physician as requiring treatment or is ... so obvious that a lay person would easily recognize the necessity for a doctor's attention."  *Monmouth County Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (citations omitted).  Persistent severe pain qualifies as a serious medical need.  "If 'unnecessary and wanton infliction of pain' results as a consequence of denial or delay in the provision of adequate medical care, the medical need is of the serious nature contemplated by the Eighth Amendment."  *Id.* at 347 (3d Cir. 1987)(quoting *Estelle*, 429 U.S. at 103, 97 S.Ct. at 290).

Mere allegations that a physician or a medical department staff member "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment . . . ."  *Estelle,* 429 U.S. at 106, 97 S.Ct. at 292.  Similarly, a "medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.  At most it is medical malpractice."  *Id.*, 429 U.S. at 107, 97 S.Ct. at 293.  "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights."  *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990).  Medical negligence alone cannot result

in an Eighth Amendment violation, nor can any disagreements over the professional judgment of a health care provider. *White v. Napoleon*, 897 F.2d 103, 108-110 (3d Cir. 1990). In sum, negligence, unsuccessful medical treatment, or an inmate's disagreement with his medical treatment is insufficient to establish deliberate indifference. *See Durmer*, 991 F.2d at 69.

The uncontested statement of facts in this case, as well as a review of Cabello's medical records, reveal that defendants believed Cabello was a type II diabetic based on his family history, HGBA1C and other blood tests. Defendant physicians prescribed Metformin and advised Cabello to adopt a healthier life style, including diet and exercise changes. While Cabello disagrees with the amount of Metformin prescribed for him, he does not dispute that when he complained of any medical ailment, including those related to his Metformin, he was promptly evaluated by medical staff. His contention that medical staff ignored the adverse side effects of his Metformin for twenty months is unsupported by the record. When Cabello presented with medical complaints, the defendants evaluated him through physical observation, blood, urine and EKG tests. His blood sugar levels and weight were also monitored. None of the treating physicians believe that Cabello's various complaints were due to his ingestion of Metformin. Cabello does not point to any laboratory test that was overlooked, misinterpreted, or intentionally ignored by any of the medical defendants that would suggest that he suffered from lactic acidosis as a result of low sugar levels caused by the overdose of Metformin.

Moreover, there is nothing in the record to demonstrate that any significant delay in examining and treating Cabello was deliberate or intentional on the part of any

defendant.  Likewise, simply because his present treating physician (non-defendant) does not wish to prescribe him Metformin even though his HGBA1C is 6.7% does not make the defendants' decisions concerning his diabetes care, or the prescription of Metformin, violative of the Eighth Amendment.  *White v. Napoleon*, 897 F.2d 103, 108-110 (3d Cir. 1990)(disagreements among health care professionals does not result in an Eighth Amendment violation).  Even if Cabello did suffer a side affect or adverse reaction to the Metformin, he has failed to show that any of the defendants knew that his ailments were caused by the Metformin.  Each time he complained of a problem, he was evaluated by the defendants who exercised their best professional judgment.  At most, Cabello suggests that the defendants were negligent and repeatedly misdiagnosed him as having the flu, a UTI, a viral infection or heat exhaustion, instead of realizing he was suffering what he calls side effects of the Metformin.  Under these circumstances, based upon the well-documented medical evaluation and treatment of Cabello for his diabetes and other medical complaints, which he believed were side effects of the Metformin, the Court finds that Defendants were not deliberately indifferent to a serious medical need.  Thus, Cabello has failed to establish an Eighth Amendment constitutional violation.  Defendants' motion for summary judgment on this claim will be granted.

  B. *Cabello's Retaliation Claim against PA Auman.*

   "Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under section 1983."  *See White v. Napoleon*, 897 F.2d 103, 111-12 (3d Cir. 1990).  "Government actions, which standing

alone, do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)(quoting *Allah v. Seiverling*, 229 F.3d 220, 224-25 (3d Cir. 2000)).

To state a claim for retaliation, a prisoner must prove three things: (1) that he had engaged in a constitutionally protected activity; (2) that he suffered "some adverse action" at the hands of a prison official; and (3) that there is "a causal link between the exercise of his constitutional rights and the adverse action taken against him." *Mitchell,* 318 F.3d at 530. To establish a causal link, the prisoner must show that the "constitutionally protected conduct was 'a substantial or motivating factor' in the decision to" take adverse action. *Rauser v. Horn*, 341 F.3d 330, 333-34 (3d Cir. 2001) (quoting *Mount Healthy City School Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977)). To show "adverse action," an inmate must demonstrate that prison officials' actions were "sufficient to deter a person of ordinary firmness" from exercising their constitutional rights. *Allah*, 229 F.3d at 225-226. If the prisoner establishes these three things, "the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Rauser*, 241 F.3d at 334; *see also Carter v. McGrady*, 292 F.3d 152, 154 (3d Cir. 2002)(retaliation claim fails where prison officials would have disciplined inmate for policy violations notwithstanding his protected activity).

According to Cabello, he "does not have any evidence that PA Auman retaliated against [him] for filing grievances." Doc. 132, Pl.'s Opp. Br. at pp. 7-8. He admits

"there is no evidence that PA Auman retaliated against the Plaintiff." *Id.* Likewise, there is no evidence that PA Auman falsified a misconduct report in retaliation for naming her in a grievance. *Id.* His dispute with her is that she ignored the adverse effects and overdose of Metformin for 20 months as did the other defendants. *Id.* Thus, based on his own admissions, Cabello's retaliation claim against PA Auman fails. Summary judgment will be granted in PA Auman's favor on the retaliation claim.

We will issue an appropriate order.

/s/William W. Caldwell
William W. Caldwell
United States District Judge

Date: March 15, 2011

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID CABELLO,                          :
                                        :
          Plaintiff                     :
                                        :
                                        :  CIVIL NO. 1:CV-08-1334
          vs.                           :
                                        :  (Judge Caldwell)
JAMES L. GRACE,                         :
SUPERINTENDENT, *ET AL*.,               :
                                        :
          Defendants                    :


*O R D E R*

          AND NOW, this 15th day of March, 2011, for the reasons set forth in the

accompanying memorandum, it is ordered that:

          1.  Defendants' motion to exceed page limitation on their brief
          in support of their motion for summary judgment (doc. 130) is
          granted.

          2.  Defendants' motion for summary judgment (doc. 128) is
          granted.

          3.  The Clerk of Court is directed to enter judgment in favor of
          defendants Araneda, Auman, Beragovskaya, and Romeo, and
          against Plaintiff.

          4.  The Clerk of Court shall close this file.


                              /s/William W. Caldwell
                              William W. Caldwell
                              United States District Judge